Good afternoon, Your Honors. May it please the Court, my name is John Barg. I represent Cargill. The question presented in this appeal is whether the Clean Water Act jurisdictional provisions extend to the seasonal accumulation of rainwater at Cargill's salt making facility. The basis for the district court's finding of jurisdiction was that the Cargill water body is adjacent to navigable waters. This is the so-called pond that the district court previously found to be totally landlocked and not connected to navigable waters in any way. I'm a little puzzled. Weren't there findings that were accepted by the district court as indisputable that there was some seepage on occasion or that the navigable water didn't occasionally overtop the berms and things like that? There was evidence presented, Your Honor, at trial in the district court that there was an inbound. There were two occasions when there was inbound water from Mowry Slough into this containment area, but never evidence of outbound. And counsel for the plaintiffs admitted that there was no undisputed evidence of an outbound migration of liquid from the containment area into the bay. I suppose there is the question whether it's an inevitable inference that if water can seep through the berm into the pond, it couldn't seep through the same conduits out of the pond. Well, Your Honor, there's no evidence of that, and I think the elevation of that so-called pond area is lower than high sea level. I mean, it would carry to a sort of a magnificent conclusion if you had water coming over Yosemite Falls. It wouldn't go back simply. At least certainly it wouldn't support an undisputed inference. Right. One of the important aspects of this, Your Honor, of this jurisdictional question, is not simply that there was no evidence of migration from this so-called pond out into Mowry Slough or the bay, but that the United States of America brought a parallel enforcement action against Cargill years ago based on the migratory bird rule, which, of course, was invalidated by the Supreme Court in Swank. After that invalidation, and Your Honors remanded this case to state court for a determination of whether there are any alternative bases for jurisdiction. It was this adjacent waters theory that had never been heard of before that became the basis for the district court's decision. The United States, on the other hand, investigated every potential basis for jurisdiction in conjunction with both the Department of Justice and EPA and then dismissed its case with prejudice. Assistant Attorney General Sansanetti testified about a month after that dismissal before Congress and said that careful and full inquiry of every jurisdictional basis was made, and finding none, the case was dismissed with prejudice. So with this backdrop, I want to sort of analyze with the court the legal analysis that goes into the jurisdictional question. From the outset, I think it's important to note that no court has found jurisdiction under the circumstances that the district court found in this case. This decision stands alone. The Clean Water Act, by its terms, extends to waters of the United States. Controlling federal regulations create a definition of waters of the United States that includes adjacency, but only with respect to wetlands. So jurisdiction is created for navigable waters, their tributaries, and wetlands adjacent to those water bodies. This court, like others throughout the country, has protected from pollution the nation's navigable waters and looks to pollution of tributaries in the same manner as it would look to pollution of a navigable water itself. And I understand that. That's not our case. We don't have pollutants going into the navigable waters of the United States or their wetlands. As Mr. Purcell frankly conceded in the district court. If that were our case, if there had been a discharge from this pond to navigable waters, this would be a different and perhaps easier case. So the plaintiffs urged the district court to apply this adjacency concept that is limited to wetlands to this so-called pond. And the district court's error, I submit, was in accepting that invitation. Not only do the controlling regulations apply adjacency only to wetlands, but the government in interpreting and enforcing its own regulations applies adjacency only to wetlands, never to waters. That was made clear in the Army Corps of Engineers position papers that were submitted to the court with our reply brief. It was made clear in the Department of Justice's dismissal of its parallel enforcement action, and it was made clear in the regulations themselves. If hypothetically a computer chip company took over this property, could they use this pond to store arsenic? Your Honor, I think they could. I think they could. I mean, that's certainly a far cry from our case. But the question, Your Honor, is could the landowner put some sort of toxic substance into that pond, which the experts say is impermeable and it doesn't discharge to navigable waters? I've likened it, Your Honor, to a swimming pool at a beachside resort. Imagine, if you will, a beach resort in Miami with its pool out overlooking the ocean beach. The landowner puts chlorine into that pool. If the district court's decision were upheld, even the discharge of chlorine to that pool would be a violation of law because the water, by virtue of its proximity to navigable water, would be a water of the United States. I mean, that can't be the law. You're probably right. I don't know, though, what kind of nexus adheres in either the statute's idea of waters of the United States or perhaps the Supreme Court's idea of adjacency, whether adjacency, as they see it, implies a requirement of some sort of a nexus between the two bodies of water and whether there could be that in this case or not. Well, Judge Candy, I think that's a great question. And there are cases developing, I think, in the courts of appeals dealing with that phrase that was used in Swank to describe the Supreme Court's earlier decision in Riverside Bayview Homes of significant nexus. And I would argue to Your Honor that significant implies something weighty. What we have here is no nexus. There is, just because this pond, so-called pond, is near Mowry Slough and, by the way, separated by a wetland, so it's not even adjacent to the slough itself. But it is at high tide, isn't it? At high tide, I think it's closer, but I don't believe those wetlands are fully inundated. I could be wrong about that, Your Honor, but the allegation in the First Amendment complaint is that Mowry Slough is adjacent to the Mowry Slough wetlands, which is adjacent to this levee, this 55-foot-wide levee that separates the containment area from everything else. The pond is located within the exterior boundaries of a wildlife refuge, is that right? It is. The federal government took it by eminent domain in 1979, but pursuant to an operating agreement allows Cargill to continue to conduct the same salt-making operations it has always conducted, and this particular containment area is used for nothing other than access to other parts of the refuge, which do provide an extraordinary habitat for wildlife. This particular site, I think Mr. Purcell and I will disagree about this, but is so highly saline, it does not provide habitat. It provides habitat to brine flies, perhaps, but it's too highly saline, and it's far more saline than the adjoining water of Mowry Slough and so on, which indicates that containment area is actually working. In the district court, Mr. Purcell urged the district court to use logic rather than to apply the controlling regulations, and you may recall from the transcript that the district court asked Mr. Purcell, you know, isn't the use of adjacency principles here not in the regulations? I mean, adjacency covers wetlands, and certainly tributaries and things are covered by the regulations, but never adjacency and waters, and he said that that was right, but you have to use logic. What do you make of the Army Corps of Engineers regulation and its definition of adjacent at any moment here? What do I make of it, Your Honor? Yeah. Is Your Honor referring to separated by a berm and that sort of thing? Yeah. What I make out of that, Your Honor, is the same thing I think that this court made out of it in the Baccarat case that was provided to the court by Mr. Purcell, which is that wetlands that are separated from jurisdictional waters by a man-made berm are nevertheless protected wetlands. The Army Corps of Engineers wants to protect wetlands. There is an enormous environmental policy favoring the protection and enhancement of wetlands. In addition, as the Supreme Court in Riverside Bayview said, wetlands is a feature of a transitional zone where water ends and land begins, making it often difficult to draw a precise jurisdictional line, and we don't have that problem with another water body as opposed to a wetland. So from my perspective, Your Honor, that regulation, like in the Baccarat case, is simply affirmation of the regulations that we think control the outcome of this case. Adjacency doesn't apply to waters. It applies to wetlands. Applying it to waters is not logical either. It's not only outside the regulations, but it's not logical because the purpose of the Clean Water Act is to protect the nation's navigable waters from pollution. So going back to my swimming pool analogy where there is no discharge to navigable waters, there is no impact on navigable waters, the purpose of the Clean Water Act is not fulfilled by applying adjacency, proximity, to a water body. In the Swank case, the court found that the gravel ponds in Cook County were isolated and were outside Clean Water Act jurisdiction, notwithstanding the fact of significant migratory bird use. Those gravel ponds in Swank are no more isolated than the so-called pond on the Cargill site. It's true that the Cargill pond, if you will, is closer in proximity to navigable waters, but it's every bit as isolated, just as isolated as the swimming pool analogy that I made, where there is no connection. Simply being closer is not enough. You're down to under five minutes. Did you want to save a little time for rebuttal? I'd like to save the balance, Your Honor. What I'd like to do, Your Honor, is submit the other issues on the briefs, that is, the non-jurisdictional issues. And unless Mr. Purcell gets to them a little bit. Okay. Thank you for your argument. Thank you, Your Honor. Mr. Purcell. Good afternoon. I'd like to start by offering a little bit of clarity about exactly what our jurisdictional theory is. There was a lot of talk in Cargill's brief about waiver and about the characterization of our theory as solely based on adjacency. There's no waiver issue here. It's true that our jurisdictional theory on this appeal is limited to the so-called adjacent waters theory, but that term is a defined term in the settlement agreement. And what it means is the theory that we advanced in our summary judgment papers and which the Court relied on in its summary judgment order. And there was more to that theory than just adjacency. This is in the record at, I think, ER 271 to 85. That's our summary judgment motion. We offered proof because we were thinking about the standard in Swank of a significant nexus between the pond and the slough. Adjacency was an important component of that. And contrary to what Mr. Barg said, when the suit was filed, which is the critical time period to evaluate here, at high tide, the slough did come within about a foot or two of the pond. And there's proof of that in the record at ER 290 to 93 and 300. There are things in your brief talking about things like the pond is used in interstate commerce, and that's outside of your jurisdictional agreement, isn't it? It's not, Your Honor. All of these issues, all of these facts were presented to the district court. And all of these, we think, Well, what did you mean then in the settlement agreement when you said you waived any adjacency? Again, adjacent waters theory is a defined term, and it was defined as the argument we presented in our summary judgment papers. And the argument we presented in our summary judgment papers was not just adjacency. It also had to do with the fact that there's an ecological connection between the pond and the slough. The same migratory birds used the pond as used the slough. The district court looked at that and said, yes, that's undisputed. Plaintiffs' experts said so. Defendants' experts said so. We talked about the hydrological connection between the pond and the slough, the fact that there are saturated soils between the two water bodies, the fact that water, and this is undisputed as well. Defendants' experts conceded this, that water does move through the berm from the slough to the pond. As you pointed out in your questioning of Mr. Barg, it is a one-way. As far as undisputed evidence, there's only undisputed evidence of a one-way connection from the slough to the pond, not the other way around. But there is a hydrological connection here. And, of course, the – Would it suit the purposes of the Act if the only way the water ever ran was from the navigable water into the pond? I think it would. I mean, I think that the broader contours of the Act, this is the way that the Supreme Court has read the Act, and this is the way that the regulators have looked at the Act. They've adopted a categorical approach, and they've said that certain categories of waters are protected, regardless of the fact whether there's a hydrologic connection, an ecological connection. This Court in the Baccarat case said that, in fact, you didn't need a hydrological connection at all. The fact that there's a berm in between a wetland and a navigable water, it doesn't really matter. And so I think that, yes, I mean, what we're looking at here is the broader nexus between this pond and the slough. That is something that the Supreme Court looked at in both Riverside. If you read Riverside closely and then Swank, they made it explicit when they were trying to sort of offer a limiting principle to deal with this isolated pond that was miles and miles from any navigable water, as opposed to the pond here, which is – The berm makes no difference if it's between the wetland and the navigable water. Are we aided by the fact that there's an agency that has a regulation that makes an adjacent wetland a water of the United States, but we don't have a regulation that makes a pond or open water or something a water of the United States merely by adjacency? It is a tricky issue, Your Honor. And I think that the place I would like to focus the Court in answering that question is on the Supreme Court's interpretation of the Clean Water Act, starting in Riverside and moving on to Swank. And what the Supreme Court said in Riverside is you have a statute that was intended to be comprehensive. You have a long history of regulation of navigable waters in this country. In 1899, Congress passed the Rivers and Harbors Act. The Rivers and Harbors Act didn't stop at just navigable waters. It said that non-navigable tributaries and their banks were also part of the body of water that was regulable by Congress. The Clean Water Act, and the Court recognized this in the Riverside case, was intended to be comprehensive. It was not intended to contract that jurisdiction. It was intended, if anything, to expand it and look at all waters in the hydrologic  Of course, in Riverside, they're also dealing with a regulation that put they're saying, is this regulation beyond the Act? And that's when they get in this language about the Act's very expansive. Do you think Riverside would have come out the same way if there had been no regulation at all? It's hard to say, Your Honor, and you're right to make that distinction with regard to Riverside. But the Court did have to first interpret the meaning of the Act. The Court did first have to look at the Act and say, okay, this was intended to be very broad. It was intended to be, include all waters that were within the reach of the commerce power of Congress. And this Court in the Leslie Salt case in 1990 affirmed that and explicitly said that the Clean Water Act is very broad, reaches every water within the commerce power of Congress. And I want to emphasize that we're not only relying on the statute. We think that the interpretation of the statute in Riverside and in Leslie Salt is very broad and does encompass these waters. But we also are relying on the regulations based on the same facts that we pleaded in our summary judgment papers, based on the ecological connection. Certainly, Swank said that the migratory bird rule is not good enough by itself when you're dealing with isolated ponds. But Swank did say that where you have a significant nexus, that waters, in fact, are regulable. And here we have a situation where you have, and it's undisputed, that the same migratory birds that use the slough, use the pond, and the tourists come using interstate commerce and scientists come to the refuge to look at these birds and to study these birds. And the regulations do provide that when you have ponds that are, or waters that are used in interstate commerce or waters whose degradation could affect interstate commerce, those are explicitly within the regulations. And here there's a situation where if this pond became so saline and so polluted through continued use by Cargill that there was no longer any kind of migratory bird life there, that would, in fact, affect interstate commerce, because people ---- Kennedy, in trouble with the prior mandate of the Court when they said, well, a migratory bird, that's not a sufficient basis of jurisdiction? I don't think so. I think that what the ---- and correct me if I'm wrong. Obviously, Your Honor wrote the mandate, and so I'll defer to you. But what Swank said is the migratory bird rule as applied to an isolated pond. And it was pretty clear we spelled out in that decision, that's not good enough. This Court reversed and remanded based on the ruling in Swank. And, again, we're not relying on the migratory bird rule standing alone. We recognize that that's not ---- that's at least so much in dispute that we're not presuming to rely on that solely. But what we're saying is that can be a factor in a significant nexus analysis that gets us within the regulations and certainly gets us within the statute. And I want to point out that in the Court's summary judgment order, and, again, this is relevant to defining what's proper here given the waiver argument in the settlement agreement, this is at ER 1280. The district court at page 10 of its summary judgment order relied not only on adjacency, but it relied on saturated soils. It relied on the fact that water did enter the pond and, in fact, regularly did at high tide. It relied on other uncontested material facts stipulated to by the experts. And, again, I think that that's probably the ecological connection and the hydrological connection issues that the party's experts were both in agreement on. The Supreme Court recently granted ---- this last fall granted cert in two cases, Karabel and Rapinos. Have you had a chance to look at those? I've had a chance to look at the Sixth Circuit opinions and the briefs in those as well. Is that ---- we're all in the prediction business, I guess, when it comes to the Supreme Court. In your clients' views, is that likely to impact the decision in this case? It conceivably could. What the defendants asked the Supreme Court to do in Rapinos and Karabel was say that you need a hydrologic connection. Basically, unless you have evidence that pollutants make their way from the regulated water into a navigable water, there's no jurisdiction. That would be at odds with what this Court did in the Baccarat case. And I think it would be at odds with the purpose of the Act. I think that it's unlikely that Congress ---- certainly there's nothing in the statute specifically that requires that kind of causal relationship where you have only waters that do contribute pollution to a navigable water are protected. No agency has ever interpreted the Clean Water Act that way either. But, again, that is the argument. And if that were the argument, then, you know, there are disputed issues of fact here. But I think then we would have to go back to the district court, and the district court would have to decide whether that had been waived, because that really wasn't anything we asserted in our summary judgment motion, because, again, it wasn't susceptible for resolution on summary judgment. It was a disputed issue. So we're very interested in seeing how those cases come out. Mr. Barg and I were actually talking about that before the hearing. Most basically, and, again, I don't want to avoid the regulations, because I do think we are within the regulations, but the most basic argument that we have is that fundamentally it makes no sense to protect a wetland on one side of a berm from the navigable water while getting no protection whatsoever to a pond. The pond is just as capable as the wetland of fulfilling the environmental functions that the Supreme Court talked about in Riverside, gave a lot of credence to. It's just as likely to transmit water to the navigable water, to collect runoff and prevent erosion, to serve as joint wildlife habitat. These things are all equally likely to happen in the context of a pond as a wetland. And the Clean Water Act was fundamentally passed to protect waters. In fact, that was the whole point of the Riverside case. There was a lot of doubt as to whether you could actually regulate a wetland under the Clean Water Act, because it's not, strictly speaking, a water. And here we have a water. If this water had been in the exact same position as the wetland in Baccarat, I think the result of this Court would have been the same. And so whether this was an oversight of the agency, because this is an uncommon factual situation, I don't know. But fundamentally, the logical result here is to protect this water. I think Mr. Barg's analogy to a swimming pool at a beachside resort is a little bit misplaced. I think you would not have in that context a significant nexus or really any kind of nexus between that swimming pool and the ocean or the sea on the other side of the beach. You wouldn't have any kind of joint wildlife habitat. The swimming pool is encased in concrete. There's not any kind of hydrological connection here. Again, here at least there's undisputed evidence of a one-way connection. And so, I mean, you're really talking about a situation where, you know, there's just very, very different. And I don't think that that should guide this Court's decision. Getting back to the logic of our underlying argument here, it's important, I think, to point out that other courts have looked at this problem and have said, yeah, it does make sense to treat wetlands the same as ponds or vice versa. The Fifth Circuit in the In re Needem case, they adopted a very, very different interpretation of the Clean Water Act from what this Court has done, much narrower, and we certainly don't advocate that. But in the course of that, of their analysis, they did treat wetlands and water bodies interchangeably. The district court in the northern district here in the Healdsburg case, it's an unpublished opinion, but we did cite it in our briefs, and they did the same thing. They had an adjacent pond. They treated it the same as adjacent wetlands as well. So, again, this is not unheard of. It's not unprecedented. It's the sort of thing that is based in logic rather than a strict reading of the regulations, but we believe it's based in a reading of the statute as the Supreme Court has done that. One other thing Cargill does is disparage the environmental value of this site. I mean, they refer to it as a seasonal pond. There's evidence in the record that although occasionally there's not a lot of water in the pond, that the soil underneath it is constantly full of water. Cargill's own expert dug a pump pit in the bottom of the pond, and it was full of water. So, I mean, there's always a lot of water in the site. But more importantly, the Supreme Court said in Footnote 9 of Riverside, and this is something that this Court relied on a lot in Baccarat and the Sixth Circuit relied on in both Rapanos and Karabel, you don't need environmental value. If something is, in fact, protected under the Clean Water Act, it's protected. Again, this goes to the sort of categorical approach that the Court has approved and that regulators have taken. The proper thing to do there is to go to the agency and say, hey, we don't think that this particular water body really deserves protection. It's not environmentally significant. Do you mind if we develop it? And presumably in that instance, the agency would say yes. And another thing that I think is worth pointing out is there's a very good reason why this pond is or may not be particularly environmentally important, and that's because it's been smothered in refinery sludge and wash pond mud for decades now. This pond used to be in a wetland in a tidal marsh right next to Maury Slough. Now, of course, it's been sort of sequestered and blocked off by this levee, but the reason that its environmental importance has been diminished over the years is because of these acts of pollution by Cargill. It didn't just happen to be that way. That, I suppose, preceded the Act, right? Yes, in fact. I mean, Leslie Salt has been using this as a dumping ground for many, many years before the Act was passed and before they sold it to Cargill in 1978. I'd like to talk a little bit more about the other issues involved in this appeal, unless the panel has any specific questions about jurisdiction. No? Okay. I'd like to start by talking about the retrospective injunctive relief issue very briefly. So you're opening this door for their comment? And that's fine. I'm happy to do that. This Court has said in the Sierra Club case, the Third Circuit said it in the Perg v. Powell-Dufferin case, numerous district courts have said it. We cite these cases in our brief that when citizens bring clean water act suits, they stand in the shoes of the government. They should be entitled to the same range of remedies as the government. The preamble to the statute directly says that the purpose of the Clean Water Act is to restore and maintain the chemical, physical, biological integrity of the nation's waters. That seems to me to clearly contemplate restorative injunctions of the kind sought here and granted by the district court in the judgment. Sections 1319 and 1365, the government suit and citizen suit provisions of the Clean Water Act, are substantively the same. One says that the Court has the power to require compliance with permit limitations. The other one says that the Court has the power to enforce those limitations. Again, textually, there is not a substantive difference there. And in the Weinberger case, the Supreme Court, in looking at a Clean Water Act citizen suit, said that district courts retain the full panoply of their injunctive powers absent some sort of clear and valid legislative command. Of course, there isn't one here. And this Court, we think, resolved this issue in Southwest Marine when it said, facing an argument much like we faced here, you're not limited when you bring a citizen suit to getting injunctive relief that says, you know, thou shalt not sin in the future. You can't violate permit limitations in the future. As long as you have a remedy that is connected to a violation, that's fine. And here, that's exactly what we have. Cargill dumped in a water, and the injunction requires them to remove from the water. It's about as narrowly tailored as you can get. I also would like to... I have a question, and maybe that's where you're getting on the notice probation. We have some cases that are, despite our statement that we interpret notice requirements strictly, don't seem very strict. But they seem to, I believe, at least some of them, have outside boundaries. They say, well, between 19X and five years later, you violated all these times whenever the wind blew more than five miles an hour or something like that. And we've said, well, that's identifiable, and the defendant can look that up. But there was perhaps an outside boundary. And here, your notice said, at least since. Is that enough to take you back behind that? It is a distinction, Your Honor, but I think it still is enough because of the way that the violation was described. And this goes to the Baykeeper v. Tosco case. And the standard there, which Your Honor just mentioned, is that any time, I believe the notice letter said, any time the wind was at a certain velocity to blow coke from this pile, or any time there was a shiploading event, that was good enough. And here what we said is, any time waste was trucked to the site and deposited at the site, and there's not any, I don't think, doubt about what the site was. Cargill only has one dump site in the refuge. So any time waste was trucked to and deposited at the site, that is a violation. And the violation happened every time Cargill or Leslie Salt did this, at least since 1991. Now, there's a little bit of a, it's a little strange to phrase it that way because, of course, Leslie Salt sold the site to Cargill in 1978. So Leslie Salt wouldn't have been responsible for anything after 1991. But that provision, we think, was enough to put Cargill on notice that what plaintiffs were looking at here were, was waste being trucked to and dumped at the site by either Cargill or Leslie Salt. And the 1991 date was the five-year date provided so that Cargill could calculate civil penalties. Roberts. Okay. We're out of time. Thank you for your argument. Thank you. We'll hear rebuttal at this time. Thank you, Your Honor. If I could, just briefly touching upon the retrospective injunctive relief. The jurisdictional provision of the Clean Water Act that allows a citizen suit allows a citizen to sue on its own behalf. The plaintiffs here did not sue on behalf of the government. They sued on their own behalf, pursuant to 33 U.S.C. Section 1365. Secondly, the Clean Water Act is not a cleanup statute. We have lots of federal cleanup statutes. We have CERCLA. We have RCRA. There are state counterparts. The Southwest Marine case, which I know, Your Honor, I think authored, did not deal with cleanup. It dealt with enjoining stormwater runoff and mandatorily requiring testing of the sediments and the water column in a sandblasting operation. It did not get to the question of a cleanup. The notice issue, I think Judge Canby's observations were exactly right. At least is the phrase that was used in the notice letter, and there was no hint, other than saying the words at least, of pre-1991 alleged violations. The other thing is that the notice letter focused upon alleged discharges to the bay, not to this so-called pond. Getting back for a moment to the jurisdictional issue. Judge Gould had a question, I think. Is the reference to Leslie Salt a hint that it goes before 91? If the notice letter says that Cargill and its predecessor polluted, is that a hint that it's giving notice of pre-91? Your Honor, to be honest with you, I had not focused on that. I don't think so. It wasn't clear from the notice letter whether the plaintiffs knew the corporate transactional history, and I think at least the way I read the letter was that they were being careful to subsume within their notice letter violations by Cargill and predecessors from at least 1991. That's how I read it. Okay. Following up on Judge Gould's question, normally when we talk about notice, we're talking about what's received by the recipient of the notice. Certainly when Cargill got it and referred to Leslie Salt, it must have entered their mind that some of this predated the letter. Well, that's not what the letter said, Your Honor, and I think they were entitled to view the letter literally. And as Judge Canby said, there have to be some limits to the adequacy of notice requirements under the federal regulations, and this just didn't put anybody on notice of pre-1991 violations in my judgment. Back to the jurisdictional issue for a moment, and I realize I'm running out of time. Riverside, of course, Riverside Bayview upheld the adjacent wetlands regulations. There were no adjacent waters regulations, and so reliance on Riverside Bayview is misplaced. We don't have a wetland here. That has been conceded by Mr. Purcell. He's conceded this is not a wetland, and he said it just doesn't make any difference that it's not a wetland. There are no adjacent waters jurisdictional regulations. He said that the Clean Water Act was intended to be comprehensive. It was not found to be comprehensive in Swank to apply to isolated ponds, which is what we have here. Ours is, as the district court found, totally landlocked and not connected to Mowry Slough or navigable waters. Go ahead and wind up. My time is up, Your Honor. Thank you very much, Your Honor. Do you agree with counsel that there is a possibility that the two cases that the Supreme Court has pending might bear on this case? It's possible that they could bear on this, Your Honor. Those were wetlands cases. The issue is whether the adjacent wetlands regulations apply in the case of a berm that prevents a hydrologic connection and in the other case dealt with discharges to ditches and then from ditches to other ditches and culverts and so on and so forth. And what does that make in terms of tributaries? Of course, there's one way they could come out that would affect the case. There is one thing that's clear to me, Your Honor, from those cases, and that is that hydrologic connection, that is outbound and impact on navigable waters, is a sine qua non of jurisdiction. And the question is whether any hydrologic connection will do or whether those that are attenuated in ditches and culverts and so on are not going to be sufficient. Okay. Thank you for your argument, counsel. Thank both sides for their arguments, and it's a very interesting case. The Court will retire to deliberate and issue further orders.
judges: Canby, Gould, Hawkins